```
 1                  UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
     UNITED STATES OF AMERICA,      .
 4                                  .
                    Plaintiff,      . No. 19-cr-4768-GPC
 5                                  .
                    v.              . January 12, 2022
 6                                  . 3:04 p.m.
     GIOVANNI VINCENZO TILOTTA,     .
 7   WAIEL YOUSIF ANTON,            .
                                    .
 8             Defendants.          . San Diego, California
     . . . . . . . . . . . . . . . .
 9
              TRANSCRIPT OF MOTIONS IN LIMINE HEARING
10           BEFORE THE HONORABLE GONZALO P. CURIEL
                  UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:      United States Attorney's Office
13                           By: NICHOLAS PILCHAK, ESQ.
                                 ANDREW HADEN, ESQ.
14                           880 Front Street, Room 6293
                             San Diego, California 92101
15
     For the Defendant       Warren & Burstein
16   Giovanni Tilotta:       By: JEREMY WARREN, ESQ.
                                 KATIE JENKINS, ESQ.
17                           501 West Broadway, Suite 240
                             San Diego, California 92101
18
     For the Defendant       Iredale & Yoo
19   Waiel Anton:            By: EUGENE IREDALE, ESQ.
                             105 West F Street, 4th Floor
20                           San Diego, California 92101

21

22   Court Reporter:         Chari Bowery, RPR, CRR
                             333 West Broadway, Suite 420
23                           San Diego, California 92101
                             chari_bowery@casd.uscourts.gov
24   Reported by Stenotype, Transcribed by Computer

25
```

1           SAN DIEGO, CALIFORNIA; JANUARY 12, 2022; 3:04 P.M.

2                              -o0o-

3           THE CLERK:  Calling matter 15 on calendar,

4    19-cr-4768, United States of America v. Giovanni Vincenzo

5    Tilotta and Waiel Yousif Anton, for motion *in limine*.

6           THE COURT:  Appearances, please.

7           MR. WARREN:  Good afternoon, Your Honor.  Jeremy

8    Warren and Katie Jenkins for Mr. Tilotta, standing in the

9    court.

10          THE COURT:  All right.  Mr. Warren, Ms. Jenkins and

11   Mr. Tilotta, good afternoon.

12          MS. JENKINS:  Good afternoon, Your Honor.

13          MR. IREDALE:  Gene Iredale, Your Honor, and

14   Mr. Anton, present before Your Honor on bond.

15          THE COURT:  Mr. Iredale and Mr. Anton, good

16   afternoon.

17          MR. PILCHAK:  And good afternoon, Your Honor.

18   Nicholas Pilchak and Andrew Haden for the United States.

19          THE COURT:  Mr. Pilchak, Mr. Haden, good afternoon.

20       You may all be seated.

21       We are here on motions *in limine* that had been filed.

22   There were two motions that, although they weren't identified

23   as motions *in limine*, are pending from the defense side.  And

24   that's a motion to dismiss Count Three, as time barred, and a

25   motion to dismiss either Count Five or Six based on

1    multiplicity.

2        The government has filed its response, and that's found on

3    ECF 235.  In its response, they agreed to move to dismiss

4    Counts Three and I believe -- is it Count Five?

5            MR. PILCHAK:  Count Six, Your Honor.

6            THE COURT:  -- and in so doing, then, that will

7    render moot these two motions.

8        So, then, the government does move to dismiss Counts Three

9    and Six?

10           MR. PILCHAK:  Yes, Your Honor.

11           THE COURT:  That motion will be granted.  That's

12   without prejudice.

13           MR. WARREN:  Your Honor, pardon me.  For Count Three,

14   which is the time-barred count, I think that should be with

15   prejudice, for obvious reasons.

16           THE COURT:  What is your position on that?

17           MR. PILCHAK:  Your Honor, I don't think we would be

18   able to refile, regardless, so I think we would be comfortable

19   dismissing with prejudice.

20           THE COURT:  Count Three will be dismissed with

21   prejudice, and Count Six will be dismissed without prejudice.

22       And that leaves the motions that have been filed by the

23   government in ECF Number 224.  And reviewing the motion, it

24   reminds me of that man (indicating), Judge Turrentine.  And he

25   was famous for, when he was asked if motions *in limine* could be

1    filed, he said "Yes"; and when asked how many, he said, "As

2    many as you want; they are all denied."

3        Here, we don't even really have motions *in limine* to

4    exclude as much as motions *in limine* to admit.  And that's not

5    the purpose of a motion *in limine*.  A motion *in limine* is to

6    exclude evidence that, if it made its way before the trier of

7    the fact, it would be either difficult or impossible to unring

8    the bell.  So the Court does not make a practice of admitting

9    statements, especially when we don't know precisely what those

10   statements will be.  We don't know the context of how it fits

11   in with respect to the rest of the case.

12       So there are a number of motions to admit.  I believe I

13   counted something like 11 of them.  There's four motions to

14   exclude, for the most part.  Those motions are rendered moot

15   given that the defense does not intend to offer things like

16   unnoticed expert evidence or entrapment defenses.

17       But the one thing that these motions *in limine* do do is

18   that it alerts the Court that there may be these issues at

19   trial, that there may be objections that will be lodged at

20   trial regarding a number of these issues.  And so, the question

21   for me is to what extent I should become involved in providing

22   these kinds of advisory opinions on how I see things.

23       I can share with you at this point I am not inclined to

24   permit firearms in the courtroom for safety reasons and

25   considerations, unless its demonstrated there's something

1    particular about these firearms and the need for the jury to

2    handle them, to see them.

3        As I understand defense counsel are prepared to stipulate

4    as to the existence of these weapons, the serial numbers of

5    these weapons, and the descriptions and such; is that correct,

6    Mr. Iredale?

7            MR. IREDALE:  Absolutely, Your Honor.  And also that

8    they are operable firearms.  They meet the definition under the

9    statute.  And I think Mr. Warren indicated that in his papers

10   as well.

11           MR. WARREN:  Agreed, Your Honor.

12           THE COURT:  So, I, at this point, don't see.

13       At the same time, there hasn't been a motion to exclude

14   the weapons, so I don't view the motion as pending in that

15   light.  At the same time, I will offer that observation, that I

16   am not inclined to admit these firearms in court as far as the

17   actual weapons versus by way of photographs.  If you wish to

18   offer photographs that depict the weapons, that depict the

19   serial numbers, that, combined with the stipulation, in the

20   Court's view, will suffice.

21       There's a couple of questions that I think the motions

22   *in limine* raise that are ones that the Court will need to

23   wrestle with, and I do appreciate the motion *in limine* being

24   offered in order to kind of highlight or tag the issue.  For

25   example, the Court should preclude prejudicial evidence of a

1   recantation defense, so it begs the question, is a recantation

2   defense a thing as it relates to the charges it has a nexus to?

3   And there are a number of cases that the parties cite to.  It's

4   something that I am prepared to look at closely so that, by the

5   time I provide an opinion or by the time that there's the

6   objection regarding this issue, whether or not -- well, let me

7   put it this way.

8        This motion is a proper motion to the extent that it seeks

9   to exclude evidence, to exclude a defense that would otherwise

10  have the tendency to confuse the jury, the issues.  And so,

11  certainly, this is, I think, the most salient motion *in limine*

12  offered with respect to Mr. Anton.

13       So I will defer at this time, but I will give you a

14  decision before trial begins.

15       As to the motion to admit co-conspirator statements,

16  that's so vague as to what is being sought to be admitted, and,

17  again, that's not the purpose of a motion *in limine*.

18       At the same time, I do see that Mr. Anton has raised

19  certain questions about the alleged conspiracy that may have

20  existed.  I think there's a view that there's no conspiracy

21  charge against him.  As I understand the co-conspirator

22  statements exception, you don't have to have a conspiracy

23  charged, so that wouldn't be an issue.  But it would need to be

24  shown there was a similar conspiracy that existed at the time

25  that the statement was made and that statement was in

1    furtherance of the alleged conspiracy.

2        And so that's something that I will look at very closely

3    by my review of the indictment, and then by what the government

4    offers in the way of establishing the existence of a

5    conspiracy; and then, from there, being in a position to

6    determine, question by question, whether or not a particular

7    question calls for co-conspirator statements or hearsay.

8    That's how I am prepared to treat that motion to admit

9    co-conspirator statements.

10       As to admitting properly noticed expert evidence,

11   ultimately, the government will have to demonstrate that the

12   witness, Mr. Chimileski, is qualified, and it looks like he

13   ultimately will be qualified to offer certain opinions as to

14   firearm transactions.  And, really, the critical question here

15   is whether or not we need someone like Mr. Chimileski to

16   provide or offer -- if not opinions, to explain the firearms

17   dealer kind of framework, the laws that apply to firearm

18   dealers, and there appear to be a number of them.

19       I tend to see that there is a need for such an expert.  At

20   the same time, I am not prepared to admit today any expert

21   evidence.  And keeping in mind that even if the Court did find

22   that Mr. Chimileski was qualified to offer certain opinions, it

23   would perhaps be restricted in terms of what those opinions

24   would be.  And I know both parties have addressed that question

25   as far as the opinions, nature of the opinions, the breadth of

1    the opinions that would be provided.

2         That is something that will play out during trial.

3         The motion to admit evidence under 404(b), there are a

4    number of areas that the government has asked the Court to

5    again admit with respect to Mr. Anton's CCW scheme, association

6    with the San Diego County Sheriff, his campaign fundraising.

7    And it seems to the Court some of this is referenced in the

8    indictment, at least as to the CCW business, the operation of

9    this business, and perhaps the plans that were associated with

10   that.

11        And as to associations with the SDCSD, it appears some of

12   this is relevant to give a flavor as to what Mr. Anton's

13   relationship was with law enforcement and how he presented

14   himself to the community, and specifically to potential

15   customers of firearms.

16        Again, the devil is in the details.  I am not going to

17   admit all of this.  To the extent the defense lodges an

18   objection to certain questions that are posed, I will consider

19   it at the time the question is posed.

20        As to Mr. Tilotta and prior inspections and alleged prior

21   facilitation of a straw purchase, those are matters that I am

22   not prepared to admit.  To the extent that there was a motion

23   to exclude, I would be prepared to admit certain information

24   relating to these prior inspections and prior straw purchases.

25   To the extent it would have provided Mr. Tilotta some

1    information, knowledge as to how these firearm sale practices

2    are required to proceed.

3         As to the motion to the firearms, I have already discussed

4    that.

5         As to admitting business records and digital evidence, we

6    are just too far ahead of ourselves as to that.  I am not

7    admitting anything there.  But to the extent there's a request

8    for the Court to apply certain authentication provisions under

9    the Federal Rules of Evidence, the Court will be mindful of

10   that as the government proceeds.

11        And then, the request to admit testimony from a percipient

12   witness who was not acting as an attorney, I will defer until

13   trial.

14        Excluding evidence under Rule 403, that's so vague that I

15   can't begin to identify what it is that I would be excluding or

16   admitting.

17        As far as precluding an unnoticed advice-of-counsel

18   defense, I believe the defense takes the position that

19   advice-of-counsel defense is not one of the defenses that the

20   Rules of Criminal Procedure require to have advance notice of.

21        And I believe that came from you, Mr. Iredale; is that

22   correct?

23             MR. IREDALE:  Yes, Your Honor.

24             THE COURT:  So, at this point, that might be a matter

25   that we will address and the only matter that I will be

1  prepared to hear further from the parties, and the next to last

2  issue is precluding prejudicial evidence of a recantation

3  defense, which, as I indicated, I am prepared to look at it

4  much more closely.

5      So, on the matter of precluding an unnoticed

6  advice-of-counsel defense, let me hear more from the government

7  on that.

8          MR. PILCHAK:  Thank you, Your Honor.  First things

9  first on that point.  We concede, as Mr. Iredale pointed out,

10  it is not required under the Rules of Criminal Procedure, like

11  an alibi defense or an insanity defense, that there's a strict

12  requirement under the rule that the defense make pretrial

13  disclosure if they are going to raise an advice-of-counsel

14  defense.

15      However, we submit the Court has the housekeeping

16  authority and the inherent authority to require the defense to

17  do that pre-trial to avoid what we submit is an entirely

18  predictable and avoidable and troubling issue which could arise

19  mid trial, which is that if an advice-of-counsel defense is

20  raised mid trial, there could be a mid trial waiver of

21  privilege, production of potentially significant information

22  from the defense that could impact our ability to keep the

23  trial going in an orderly fashion, which is always a concern

24  for the parties' resources and the Court's resources, but we

25  would submit it is an especially acute concern if we are trying

1    to keep a jury seated and keep witnesses parading through the

2    courtroom during the circumstances we are operating under now.

3         So our request is, to the extent that the defense can

4    predict it, based on, for example, all the briefing that we

5    have just filed to frame up the issues for trial and the many

6    pages of detailed pleading and the superseding indictment,

7    whether this is likely to be an issue for the defense, we would

8    request that the Court require them to make a pretrial

9    showing -- not of the complete contours of the defense, but so

10   we can decide, if there's to be a waiver of privilege, what its

11   bounds are, and hopefully have that information disclosed even

12   a short time pretrial, so we don't need to pause the trial, for

13   example, during the defense case.

14        THE COURT:  And let me ask, where, if at all, does

15   reciprocal discovery fit into this?  Do you claim that, under

16   the reciprocal discovery obligation that the defense has, they

17   would be required to identify any of this information or

18   witnesses relating to this?

19        MR. PILCHAK:  Yes.  But let me start by saying it is

20   not clear to the government that there is any advice-of-counsel

21   defense here as to Mr. Anton.  We just don't have access to the

22   full set of facts of Mr. Anton's history with counsel in

23   general and then Mr. Bajaj -- that's Vikas Bajaj, B-A-J-A-J --

24   in particular.  As Mr. Iredale referenced in his papers,

25   evidently Mr. Anton has gotten some legal advice from him over

1   the years.  We don't believe that that directly relates to the

2   issues that are likely to come up at this trial, but I suppose

3   that's a theoretical possibility, even though Mr. Bajaj never

4   identified himself to any agents as a lawyer of Mr. Anton.

5       And so, our position would be, if Mr. Anton, at trial,

6   through himself or another witness, were to say, "I did what I

7   did because of the advice of a lawyer," we would be entitled to

8   a privilege waiver at least on that subject, and if there were

9   written communications, for example, we do believe we would be

10  entitled to those.  And I think it would be a problem if this

11  only reared its head on day 11 of trial, in the midst of a

12  fast-paced jury trial.

13          THE COURT:  Mr. Iredale, would you like to respond?

14          MR. IREDALE:  Yes, Your Honor.

15      Counsel has cited no case that requires us to disclose

16  this in advance of trial.  He has cited no case certainly that

17  requires the defense to make a proffer or offer of proof of the

18  defendant's testimony if the defendant elects to testify at

19  trial.  There appears to be no authority in the rules that the

20  government relies upon.

21      And I don't mean to be obnoxious or nasty, but this is

22  what is so interesting about the practice of trials.  Things

23  happen.

24      And so, in the absence, I think, of any rule or law or

25  case that compels us to disclose, in advance of trial, what a

1    defense will be, I think I am entitled to and, indeed, arguably

2    under an obligation, to decline to do so.

3        I am sympathetic that the government says, "Well, the

4    Court has certain powers of a housekeeping nature," and

5    certainly I do agree that the Court does have residual

6    authority to make sure that the jurors' time is properly used.

7        But as I said in the papers, I understand the

8    consequences.  If there is testimony or evidence Mr. Anton did

9    something with the advice of counsel or refrained from doing

10   something with the advice of counsel, that would, as a matter

11   of law, involve the waiver of the scope of communications that

12   he had with any counsel upon which he relied.

13           THE COURT:  Let me ask you, if we were to have this

14   scenario play out mid trial, where, during the defense, then,

15   we would have this advice-of-counsel defense presented, and the

16   government asserts that creates an issue relating to the waiver

17   of privilege and then requires some follow-up, do you agree

18   with the government that, then, to the extent that there is

19   this advice-of-counsel defense, then there is this waiver of

20   privilege and that to have that happen in the middle of trial,

21   that that would produce delays?

22           MR. IREDALE:  No, I don't believe it would.

23           THE COURT:  And why --

24           MR. IREDALE:  I don't concede that.

25           THE COURT:  Why does the government believe there

1    would be these delays?

2             MR. PILCHAK:  It is a problem of we don't know Your

3    Honor.  We don't know which attorneys that would implicate.  We

4    don't know what the record would be, whether there would be

5    voluminous communications or any communications with those

6    attorneys or what form those materials would be in.  That

7    information is unknown to us.

8         We are doing our best to frame this for the Court so the

9    Court can manage its resources and the parties' resources as

10   best we can.  I understand what Mr. Iredale is saying; it is

11   just we don't have all the facts.

12            THE COURT:  Well, certainly, part of -- if not the

13   tools, part of what defense lawyers rely upon is the element of

14   surprise at trial.  And so --

15            MR. IREDALE:  Unfortunately, it's very overrated,

16   Your Honor.

17            THE COURT:  And I am reluctant to order Mr. Iredale

18   in advance of trial to provide notice of a possible defense

19   that is not otherwise required to be disclosed.

20        But, I am mindful of the need to keep our trial moving and

21   not creating unnecessary delays.

22        And Mr. Iredale, as you already know, when I speak to the

23   jury at the beginning of the case, I tell them that I will do

24   everything in my power to avoid unnecessary delays.  So then,

25   what I would ask of you is, upon the government concluding its

1    case-in-chief, that then as soon as possible after that for you

2    to notify the Court whether or not you intend to proceed on one

3    of these fronts so that, outside the presence of the jury, we

4    can take up any issues that may relate to that.

5              MR. IREDALE:  Of course, Your Honor.  I understand.

6    And I will absolutely comply with your direction.

7              MR. PILCHAK:  Your Honor, I did have one other fact I

8    just wanted to call to Court's attention while we are on that

9    subject.  I know the Court is already aware of it, and I don't

10   mean to make too much of this.  But there is the potential, of

11   course, for I think Mr. Iredale's own advice to be at issue

12   depending on how the matter of the sequence of events that I

13   know the Court is going to defer ruling on plays out; which is

14   to say, after February 13 of 2019, when the obstruction of

15   justice, that's charged in Count Eight occurred, there's this

16   sequence of events leading up to Mr. Anton's subsequent

17   telephone calls where he urges the undercover to tell the

18   truth, contrary to his prior instructions.

19       Again, we don't know what the facts are between those two

20   phone calls, but there are certain suggested pieces of evidence

21   that may draw Mr. Iredale into the equation as well.

22       Again, I don't mean to urge the Court to reach any

23   conclusion on that, but I don't want to seem like we are

24   leaving that out of the discussion either.

25             MR. IREDALE:  Let me do this.  I understand now what

1    counsel's concerned with, and I can put his mind to rest to

2    this extent.  There will not be an advice of counsel based on

3    my advice to the defendant, nor any discussion of any

4    communications I had with him.

5            THE COURT:  Does that satisfy you, Mr. Pilchak?

6            MR. PILCHAK:  That is certainly helpful as to that

7    part of the discussion, yes.  That closes off any issue on that

8    front.

9            THE COURT:  All right.  So, I addressed the various

10   issues contained in the motions *in limine* filed by the

11   government.  Given my observations, my views, and my

12   inclinations how the Court will proceed, does either side wish

13   to be heard further?

14           MR. PILCHAK:  Your Honor, just only as to one motion.

15   This is the motion that's tagged as I, in our *in limine* filing,

16   at page 19 of our motions.

17      I know the Court had mentioned this request to exclude

18   evidence under Rule 403 as being vague.  I just wanted to see

19   if I could sharpen that up for the Court because, in the

20   government's estimation, this is an issue that if the Court

21   were to rule mid trial --

22           THE COURT:  Are we talking about the health

23   consequences?

24           MR. PILCHAK:  Yes.

25           THE COURT:  Yeah.  To the extent that that is a

1    motion to exclude and that is the purpose of a motion *in*

2    *limine*, I would be inclined to prevent reference to these

3    health issues that may have been created as a result of how the

4    search warrant was executed on February 13.  On that one, I

5    would be inclined to direct the defense not to offer evidence

6    regarding that.

7              MR. PILCHAK:  Thank you, Your Honor.

8              THE COURT:  Mr. Iredale?

9              MR. IREDALE:  May I clarify that, Your Honor?

10       The government concedes that any evidence concerning the

11   events of the search and -- what happened is the search

12   occurred, and Mr. Anton's wife prematurely gave birth on that

13   very day he believes as a result of the stress of that search.

14       The government, in its papers, concedes that that is

15   relevant to his state of mind on the 13th, the 14th, and we say

16   also on the 18th and 19th, depending on Your Honor's ruling on

17   the renunciation defense.

18       And so I take their point, and I think it's a valid one.

19   In other words, any consequences after the relevant dates that

20   have to do with the charges and the indictment, I don't intend

21   to raise that issue.

22       But the events of that day, and specifically his wife's

23   premature delivery, that occurred at or about the time of his

24   discussions on the 13th, 14th of -- I think it was February; I

25   could be wrong --

```
 1              THE COURT:  So, are you saying that your client would
 2    point to his wife's premature giving birth as being something
 3    that impacted his statements, his questions, his -- whatever
 4    actions?  And it would just be limited to that?  That his wife
 5    had a miscarriage, and he feels a certain way?  Or that there
 6    was a search, and that he believes that the search led to the
 7    premature birth of his child, and all of that then is what was
 8    in his state of mind?
 9              MR. IREDALE:  First, it wasn't a miscarriage; it was
10    a successful delivery.
11              THE COURT:  I am sorry.  I meant to say premature
12    birth.
13              MR. IREDALE:  Yes.
14        And, secondly, the events that he witnessed that day and
15    which were fresh in his mind at the time of the discussion with
16    the government agent --
17              THE COURT:  That he did not know was a government
18    agent.
19              MR. IREDALE:  That he didn't know was a government
20    agent, that's right.
21        But it's also referenced, you may see, in the Government's
22    attached text that occurred on -- I believe it was
23    February 18th or February 19th, where the agent says to him,
24    "Hey, what you are saying to me now is not what you told me
25    then."
```

And Mr. Anton's response was, "Well, I don't know WTF I told you then because my wife was in delivery.  I just had my house searched," et cetera.

So we believe, and the government, I think, in its papers concedes, that those events are relevant to his state of mind.

Now, the other thing is I don't intend to get into elaborate detail or to engage in the kind of inquiry that would implicate undue prejudice.  But I think it is clearly something that is of moment and may be touched upon.

As to whether or not happened as on the 19th of February with respect to anybody's health, that's not going to be brought up, at all.  But, I just wanted to clarify the scope of Your Honor's ruling so I don't run afoul of it.

THE COURT:  Yes.  All right.  And so, as you noted, the government does concede that evidence of the events that Anton was aware of before he made the February 13 and 14 telephone calls constituting the obstruction of justice charge would be admissible as bearing on Anton's state of mind, assuming the proper foundation is laid.

Their view is that evidence of health consequences experienced by the family after the charged conduct concluded -- that would be, I guess, after February 14 -- is not relevant.

Do you share that view or do you have a different view?

MR. IREDALE:  Well, I don't want to get into the

1    argument on the abandonment or renunciation defense.

2        Our view of that is that continues through the discussions

3    between the parties through the 19th of February, but that's

4    contingent upon Your Honor's ruling.  So, in essence, Your

5    Honor's ruling on the latter question will determine the time

6    scope of the admissibility.  In other words, Your Honor's

7    ruling will determine is it the 14th or is it the 19th.  But

8    beyond the outside date, I agree with their position.

9            THE COURT:  Anything further from the government?

10           MR. PILCHAK:  No, Your Honor.  Sounds like we have

11   all had a meeting of the minds, pending the Court's ruling, of

12   course, on the issue.

13           THE COURT:  Yes.  Yes.

14           MR. IREDALE:  And then, Your Honor, I was wondering

15   if Your Honor would hear me on the renunciation issue briefly.

16   I know it was thoroughly briefed, but I wanted to just bring a

17   couple of points to Your Honor's attention.

18           THE COURT:  All right.

19           MR. IREDALE:  First, I realized that I should have

20   drawn to the Court's attention a federal statute in a different

21   context.  It's 18 U.S.C. Section 373.  The particular section

22   is (b).  I believe the government may have touched upon it in

23   their responsive papers.

24        This is with respect to the issue of solicitation to

25   commit an offense involving a crime of violence.  And so,

1    Section (a) makes it a federal offense to solicit another

2    person to commit a crime of violence.  Section (b) makes it an

3    affirmative defense for a defendant to raise the issue of

4    renunciation or abandonment.  It places upon the defendant the

5    burden of raising the issue and of proof, so it makes it truly

6    an affirmative defense; but it does provide, in that context, a

7    Congressional recognition as to those offenses of the defense

8    of abandonment or renunciation.

9                THE COURT:  But that's not the statute.

10               MR. IREDALE:  That's not this statute.

11        But I realize, just in the interest of -- occasionally,

12   the papers partake of law school discussion and debate, and

13   this brought me back many, many years to a discussion of

14   attempts, because law professors love to raise the issue of

15   impossibility, or factual or legal impossibility and attempt.

16        Now, in the Ninth Circuit at least, impossibility, whether

17   you denominate it factual or legal impossibility, is not a

18   defense.

19        In other words, the fact that Mr. Anton, in speaking

20   initially to the agent, was speaking to somebody who was

21   recording him and who was not going to do what he said no

22   matter what; and, arguably, because he was a government agent

23   would not be a person who would be under the strictures of the

24   statute; and in speaking with that agent and supposedly

25   attempting to have him conceal information from the federal

1    government, he was speaking to a member on the federal

2    government.  So, arguably, that's as close to impossible as you

3    can get.

4         But -- but, as I read the Ninth Circuit case law, our

5    circuit has rejected both factual and legal impossibility in

6    the context of attempt liability.  Of course, there is no

7    general federal attempt statute.  So, it depends upon the

8    particular statute as to the way "attempt" is defined.

9         Now, as I read the government's papers, basically what

10   they are saying --

11            THE COURT:  You know what?  I think we are kind of

12   ahead of where I am at, because -- and I can provide you with a

13   hearing date for us to go over this particular issue at such

14   time when I have not only closely reviewed the papers but the

15   cases and have a greater comfort level in having this

16   discussion.

17        At this point, I am more listening to you, and recognizing

18   that I still have to compare what you are saying with a number

19   of cases from the Ninth Circuit and arguments that you have

20   otherwise lodged.

21        So, would you like that opportunity, Mr. Iredale?

22            MR. IREDALE:  Yes, Your Honor, if that would be

23   possible.

24            THE COURT:  Yes.  We are set for trial on March 8,

25   and God willing, the omicron wave will have subsided by then.

1    But with the trial beginning on March 8, I can offer you a

2    hearing on -- how does February 28 look in the afternoon.

3        (Discussion between clerk and Court.)

4            MR. PILCHAK:  There's nothing in particular about the

5    28th, Your Honor; but the United States would respectfully

6    request, if the Court could hear it sooner, that may help the

7    parties.

8            THE COURT:  I can -- the 21st?

9            MR. WARREN:  That might be a holiday.

10           THE COURT:  You don't want it on a holiday?

11           MR. IREDALE:  That's President's Day.

12           MR. PILCHAK:  Is the 18th available, Your Honor?

13       (Discussion between clerk and Court.)

14           THE COURT:  Let's do it February 18, at 2:30 p.m.

15   And that's on this one motion *in limine* regarding renunciation

16   or abandonment.  And then, given that it relates only to

17   Mr. Anton's motion, I will not require Mr. Tilotta to be here

18   for that or counsel.  But if you wish to be here, you are

19   welcome.  But that is the issue that we will be proceeding

20   with.

21           MR. IREDALE:  Thank you, Your Honor.

22           THE COURT:  Is there anything else, Mr. Iredale?

23           MR. IREDALE:  Just this.  I am wondering if the Court

24   would give me permission to file one additional memorandum.  I

25   don't want to deluge the Court, but no more than five pages on

1    the relevant issues.

2            THE COURT:  I will give you three pages.

3            MR. IREDALE:  Okay.

4            THE COURT:  And then the government can reply.

5            MR. IREDALE:  Your Honor, may I just commend the

6    Court on your Solomonic wisdom which you have just

7    demonstrated, chopping that baby right down the middle.

8            THE COURT:  Oh, Mr. Iredale, cut the crap.

9        We will have you then file those papers on February 11.

10   And then, if the government chooses, they can reply by the

11   16th.  All right?

12       And then, anything else, Mr. Iredale?

13           MR. IREDALE:  No, Your Honor.  Thank you.

14           THE COURT:  Anything else from the government?

15           MR. HADEN:  Your Honor, I was just going to say,

16   given your reference -- I have one substantive matter to

17   address, but given your reference to the ongoing omicron

18   variant, I wonder if it might make sense --

19           THE COURT:  To have a status hearing?

20           MR. HADEN:  -- to limit it to that issue, but make it

21   a status, and have Mr. Tilotta come as well?

22           THE COURT:  Well, I think, given how quickly the

23   omicron virus came out of nowhere and inundated our hospitals

24   and created these problems -- and then we have seen, in Africa,

25   just plummeted overnight -- I think that February 18th, which

1    is five, six weeks from now, is kind of an eternity in omicron

2    time.  So that might be a good time to see whether or not we

3    are still in a position to proceed to trial because that will

4    be about two and a half weeks before -- I don't know if that

5    creates any issues for you in terms of scheduling witnesses,

6    but it seems to me that would be a sweet spot.

7         MR. HADEN:  That would be our request, Your Honor, if

8    Mr. Warren --

9         THE COURT:  So, in that case, I will ask Mr. Warren

10   and Ms. Jenkins and Mr. Tilotta to be present on that date as

11   well.

12      With that, Mr. Tilotta, Mr. Anton, you are instructed to

13   be here on February 18, at 2:30 p.m.

14      Do you understand, Mr. Tilotta?

15        DEFENDANT TILOTTA:  Yes, Your Honor.

16        THE COURT:  And Mr. Anton?

17        DEFENDANT ANTON:  Yes, Your Honor.

18        THE COURT:  And then is there --

19        MR. HADEN:  I have one other substantive issue, Your

20   Honor, if I could, in regards to the one of the motions that

21   you discussed.  It's to admit the firearms.  And I understand

22   the Court's ruling.  I wonder if I couldn't just complete the

23   record a little bit more completely.

24        THE COURT:  All right.

25        MR. HADEN:  Although we had not heard from the

1    defense in regards to stipulations until the exchange of

2    filings, we appreciate the willingness to provide some economy

3    and some efficiency.  But this is a trial about firearms.  And

4    we are not talking about all of the firearms.  There were

5    originally, at the time of the warrants, 475 firearms seized.

6    But there are specific counts in this case that relate to

7    specific firearms that sort of are really important to, for

8    example, Mr. Tilotta's *mens rea*.

9         For example, in the count where, allegedly, he took

10   firearms to be transferred and delivered to captain -- to

11   Mr. Bajaj, he took them to the Rancho San Diego substation and

12   helped do that transfer.  It is not enough, in the United

13   States' opinion or it can't be overcome on a 403 analysis, that

14   the jury shouldn't see what it is we are talking about.

15        We are talking about an FFL, leaving his place of

16   business, going somewhere not to the residence of the purchaser

17   or the recipient of the firearms.  He is going into a sheriff's

18   substation with an AR-15.  And we are not making an allegation

19   that there has been any violence with the weapons.  We are not

20   making an allegation that anyone was shot or injured.  And that

21   will be clear.  There will be no inference that anyone was shot

22   or hurt by the weapons.

23        So the weapons become important as the jurors'

24   understanding of what it is we are talking about and how

25   obvious it would have been to a responsible gun store owner,

1    that he is not supposed to be behaving in this sort of

2    behavior.

3         And these are firearms.  The importance of this -- and we

4    can't put words in Mr. Warren's or Mr. Tilotta's mouth, but we

5    suppose from the filings and from other conversations that one

6    defense in the case is going to be, "Well, none of the people

7    who got the guns were prohibited, so this is all just

8    paperwork.  It's really not that big a deal."

9         And one of the ways the United States would help color the

10   response to that is it is a big deal.  These objects are really

11   serious.  They are large.  They are physical.  They are

12   dangerous.  And the jury should be entitled to see them,

13   especially in light of other things that will be made clear to

14   them.

15        There's no allegation that any of these were used in a

16   crime.  There is no allegation anyone was shot or injured.  But

17   that they should see what it is we are actually talking about.

18   And I would humbly suggest it is not unduly prejudicial and

19   there's something lost with just the photographs.

20        So, I wonder if, based on that additional conversation,

21   there is a universe of firearms, a smaller subset, that the

22   Court would allow the United States to bring to court to color

23   evidence, specifically certain situations and seizures, to help

24   them understand.  For example, Mr. Corey is a businessman from

25   Rancho Santa Fe.  He bought two very specific firearms, and why

1    he wanted them and how he knew he couldn't have them unless he

2    had Mr. Garmo's help.  There are specific transactions that

3    would come to light and would be much more accessible to the

4    jury were we allowed to use the physical objects that were the

5    corpus of the crime.

6            THE COURT:  And I think one person's color is another

7    person's undue prejudice.  And keeping in mind that this case

8    begins with this idea that deputy sheriff, or Deputy Chief

9    Sheriff Garmo basically engaged in a scheme to take advantage

10   of his official position in order to make money selling guns.

11   It just happens that guns is incidental to this scheme that he

12   hatched to make money.

13       So, I know that when Deputy Sheriff Garmo was in the case,

14   that would have provided sufficient color, that wouldn't need

15   weapons, because he would have been alleged to have sold his

16   badge and engaged in improper official corruption.  And now,

17   without him, then perhaps the case becomes a little bit -- if

18   not dryer, a little bit more technical.

19       And so, then, the government knows that guns scare people,

20   that guns are things that create apprehension and fear.

21       At the same time, it's clear that the State of California

22   has created this set of rules that carves out exceptions for

23   law enforcement officers to bear, to sell weapons that the

24   public would not be in a position to do.  And that's the will,

25   the wisdom of the legislature.

1    I am not inclined to let in a parade of guns.  At most, if

2    there's a sufficient showing that, as you offered up the

3    scenario, that, on a given date, that you have an FFL leaving

4    his place of business, going to the sheriff's substation with

5    an AR-15.  And keeping in mind that I am not even sure how much

6    that advances the ball up the field as far as showing some sort

7    of intent to commit the crime.

8    So I still think you have some work to do.  I don't --

9    that argument doesn't particularly resonate with me as of this

10   moment.

11   Any response from the defense?

12       MR. WARREN:  I am not going to talk you out of

13   your -- I agree with the Court.

14       THE COURT:  Anything further, Mr. Haden, on that

15   front?

16   Is there some other theory of -- if not admissibility, a

17   theory that will resonate with this Court as to why the jury

18   needs to see?

19       MR. HADEN:  Your Honor, I think our primary theory

20   was there are -- as the Court said, there is the scheme.  There

21   are Counts One and Two that relate to a larger date of

22   conspiracy and conduct, but that there are individual counts

23   with both defendants and with Mr. Tilotta, there are individual

24   counts related to individual firearms.  So we tried to be

25   judicious in narrowing down what firearms we thought would be

1   relevant and helpful to the triers of fact.

2       But to the extent the Court is doing a 403 balancing and

3   doesn't think that that many firearms would be relevant, maybe

4   we can do a better job of paring that down and readdressing

5   that with the Court as to what smaller subset we think provides

6   evidentiary value that really can't be balanced to an undue and

7   unfairly prejudicial situation for the defense.

8       We are -- to make it clear, we are not trying to scare or

9   inflame anyone.  It is the seriousness of this case.  And

10  there's a willfulness requirement on Mr. Tilotta's part as to

11  at least one of the counts where he has to know that this is,

12  and the objects he is selling, here, we think are important to

13  that conduct.

14          THE COURT:  And I buy the idea that willfulness is an

15  element here.  And I also have indicated that I buy the idea

16  that, to the extent that Mr. Tilotta had communications with

17  ATF regarding some past alleged straw purchase, that those are

18  the kinds of things that provide currency to this idea of

19  willfulness.

20      But the fact that he has these weapons and he is carrying

21  them from here to there, it doesn't particularly resonate with

22  me, because that's what the law provides for.  It says that

23  FFLs can do some of these transactions under certain

24  circumstances.

25      And perhaps -- and the government's theory is that that

1    exactly is the thing, is that Mr. Tilotta was conducting this

2    transaction in that way that was not sanctioned.  And that's

3    why you need the expert.  That's why I am prepared to allow

4    your expert.

5        I am prepared to have you bring in some witness, some

6    evidence, to kind of round out your case.  But as far as the

7    weapons themselves, I don't at this time see it.

8            MR. HADEN:  Understood, Your Honor.  And I appreciate

9    you letting me bring it up.  Logistically, if we were going to

10   bring firearms, that does require us to make sure they are safe

11   and get things in order in advance of trial.

12           THE COURT:  All right.  Thank you.

13       Anything else, Mr. Warren?

14           MR. WARREN:  Yes, Your Honor.

15       I have -- it's going to sound scary -- four things, that

16   will take about one minute to do.

17           THE COURT:  All right.

18           MR. WARREN:  Your Honor, you had said that I could

19   raise some of this sort of generic or typical *in limine* motions

20   orally.  I think Your Honor ahs already ruled the parties will

21   get some attorney-conducted voir dire.

22       The second one would be -- and I think this is the Court's

23   common practice -- is the indictment would not be provided to

24   the jury.

25       The third thing would be that each juror would get an

1    individual copy of the jury instruction.

2        The fourth one is the only one a little bit different and

3    I think it applies here.  Under Rule 24(b) of the Federal Rules

4    of Criminal Procedure, the Court is authorized to provide

5    codefendant or multiple defendants additional peremptory

6    challenges.  And I think, in this case, given all the issues

7    involved and the fact that our clients -- although there's one

8    overlapping charge, they were charged separately in different

9    types of offenses, I think it would make sense to provide some

10   additional peremptory challenges to the defense.

11       And I would ask for four.  I think of the sentencing

12   guidelines; we do things in twos.  And then I would ask that we

13   each be allowed to individually exercise the peremptories.

14           THE COURT:  Yeah, I am not feeling that.  You have

15   the government, over here; they are worried about how dry the

16   case might be because it's kind of a failure to dot Is and

17   cross Ts, and that's why they would like to bring in guns.

18       I just don't see this as the kind of case that would

19   warrant these additional peremptories.

20           MR. WARREN:  Thank you, Your Honor.

21       I would ask the Court to deny it without prejudice.  Let's

22   see -- having recently picked are a jury here, you never know

23   who the jurors are going to be.  Maybe if there is an

24   appropriate motion when we have an actual, live jury, we can

25   re-raise it.

1          THE COURT:  And I will definitely grant you leave to

2     do that.  If, during the jury selection process, it becomes

3     clear that there's some problems that are looming on the

4     horizon that point to the need for additional peremptories, I

5     will consider it at that time.  But I don't see it at this

6     moment.

7          Anything else?

8          MR. PILCHAK:  Just as to Mr. Warren's other requests,

9     I don't know if the Court's addressed those.

10         We are fine with attorney *voir dire*.

11         THE COURT:  Yes.  And I always provide that, and the

12    only question would be how long.  15 minutes?  15 minutes per

13    side -- per attorney.  Mr. Iredale, Mr. Warren, 15 minutes for

14    each of you.  And then, for the government, 15 minutes.

15         And then, yeah, I will provide jury instructions for all

16    of the jurors.

17         And then I don't send the indictment back.

18         MR. PILCHAK:  Okay.  And just to circle back to one

19    of the *in lims*, to confirm for my own notes, the Court had

20    found motion to preclude defense experts was moot because the

21    defense doesn't plan to call experts?

22         MR. IREDALE:  Yes.

23         THE COURT:  Yes.

24         MR. PILCHAK:  Thank you.

25         THE COURT:  With that, that will conclude these

1   proceedings.  Take care and stay safe.

2            MR. WARREN:  Thank you, Your Honor.

3            MR. IREDALE:  Thank you, Your Honor.

4            MR. PILCHAK:  Thank you, Your Honor.

5        (End of proceedings at 3:57 p.m.)

6                         -o0o-

7                C-E-R-T-I-F-I-C-A-T-I-O-N

8            I certify that the foregoing is a correct
    transcript from the record of proceedings in the above-entitled
9   matter.  Dated:  May 1, 2023.

10                        /s/  Chari Bowery

11                        _____

                          Chari Bowery, CSR No. 9944, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25