1                      UNITED STATES DISTRICT COURT

2                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3
    UNITED STATES OF AMERICA,       .
4                                   .
                    Plaintiff,      . No. 19-cr-4768-GPC
5                                   .
                    v.              . February 18, 2022
6                                   . 2:30 p.m.
    GIOVANNI VINCENZO TILOTTA,      .
7   WAIEL YOUSIF ANTON,             .
                                    .
8                  Defendants.      . San Diego, California
    . . . . . . . . . . . . . . .
9
            TRANSCRIPT OF MOTIONS IN LIMINE/STATUS HEARING
10            BEFORE THE HONORABLE GONZALO P. CURIEL
                     UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Plaintiff:        United States Attorney's Office
13                            By: NICHOLAS PILCHAK, ESQ.
                                 ANDREW HADEN, ESQ.
14                            880 Front Street, Room 6293
                              San Diego, California 92101
15
    For the Defendant         Warren & Burstein
16  Giovanni Tilotta:         By: JEREMY WARREN, ESQ.
                                 KATIE JENKINS, ESQ.
17                            501 West Broadway, Suite 240
                              San Diego, California 92101
18
    For the Defendant         Iredale & Yoo
19  Waiel Anton:              By: EUGENE IREDALE, ESQ.
                              105 West F Street, 4th Floor
20                            San Diego, California 92101

21

22  Court Reporter:           Chari Bowery, RPR, CRR
                              333 West Broadway, Suite 420
23                            San Diego, California 92101
                              chari_bowery@casd.uscourts.gov
24  Reported by Stenotype, Transcribed by Computer

25

```
1          SAN DIEGO, CALIFORNIA; FEBRUARY 18, 2022; 2:30 P.M.
2                              -o0o-
3          THE CLERK:  Calling matter three on calendar,
4    19-cr-4768, United States of America v. Giovanni Vincenzo
5    Tilotta and Waiel Yousif Anton, for motion in limine hearing
6    and status regarding trial.
7          THE COURT:  Appearances, please.
8          MR. PILCHAK:  Good afternoon, Your Honor.  Nicholas
9    Pilchak and Andrew Haden for the United States.
10         MR. IREDALE:  Gene Iredale, Your Honor, for
11   Mr. Anton, who is present before Your Honor, on bond.
12         THE COURT:  All right.  Good afternoon.
13         DEFENDANT ANTON:  Good afternoon, Your Honor.
14         MR. WARREN:  Jeremy Warren and Katie Jenkins for
15   Mr. Tilotta, who is also present.
16         THE COURT:  And just so you know, I am not requiring
17   individuals who are vaccinated to wear a mask in the courtroom.
18   If you have been vaccinated, you can feel free to take your
19   mask off.  If you want to wear it, that's also up to you.
20       We are here on a motion in limine that was left open at
21   the motion in limine hearing that we held on January 12, and it
22   is the motion which seeks to exclude evidence of a recantation
23   defense.
24       The government's supporting papers were filed
25   December 10th.  The defense filed on December 24th, and then
```

1    the government replied on December 31st.  I permitted

2    supplemental papers to be filed, and so the defense filed their

3    supplemental memorandum regarding renunciation on January 21st,

4    and the government replied on February 15th.

5         So, I have reviewed the papers that have been filed.  I

6    have reviewed a number of cases that the parties have

7    referenced.  I have further reviewed the Model Penal Code,

8    which has been relied upon by the defense.

9         And while there's a lot of maybe -- if not ambiguity and

10   uncertainty, there's a lot of differing views on some of this.

11        The one thing that is clear to me is that there's not a

12   case that directly identifies what are the circumstances under

13   which the Court would exclude evidence offered on a

14   renunciation or abandonment defense.  The cases that I have

15   reviewed invariably involved situations where a defendant had

16   been convicted at trial; the defendant claimed that there was

17   insufficient evidence because there was evidence offered at

18   trial that would have shown that the defendant abandoned or

19   renunciated his criminal activities.  There are other cases

20   where defendants would have appealed and argued that the Court

21   below erred because the Court failed to provide an abandonment

22   or renunciation instruction.  But the precise issue that we

23   have here -- whether or not evidence should be excluded -- was

24   not addressed.

25        And so, those cases, the evidence that would have

 1    supported abandonment or renunciation actually made it into the

 2    record.  It was considered; it was taken into account by any

 3    number of judges who found that, based upon the state of the

 4    record, the instruction was not appropriately given.

 5        At the same time, I appreciate that, to the extent the

 6    Court were to conclude that there is no abandonment or

 7    renunciation in the context of an attempt offense, then

 8    evidence that's offered for purposes to support such a defense

 9    would not be relevant.  And particularly, here, where that

10    evidence could confuse the jury as to its consideration of the

11    charges of attempt, it would present a scenario where the Court

12    would want to exclude that evidence as a threshold matter.

13        So, that's kind of where I am in the process of

14    identifying -- well, one, distilling the law as I understand

15    it.  I think the First Circuit and the Eighth Circuit have come

16    down strongly that there is no abandonment defense in the

17    context of an attempt charge.  And that, to the extent that a

18    defendant questions whether or not he did more than intend to

19    commit a crime and that he in fact took a substantial step in

20    the commission, that that is where the fight is; that that is

21    where the Court should focus on in terms of how the case should

22    proceed.

23        And in this case, we have a set of facts that are much

24    different than the cases that have been cited.  We have a

25    number of drug cases; I think maybe one or two bank robbery

1  cases.  And so there are instances where the alleged

2  recantation took place pretty much in real time, while this

3  alleged crime was unfolding.

4      Here, we have, temporally, a five-day delay or five-day

5  time frame where the government asserts that there was these

6  efforts to dissuade a witness on day one; and that it was not

7  until five days later that, then, there are these efforts to

8  unwind, undo, or otherwise direct the would-be witness to tell

9  the truth.

10      Given the fact that this would-be witness is law

11 enforcement and would not have been in the position to be

12 dissuaded, it also raises interesting questions.

13      But, given those circumstances, it would be a little

14 easier to look at these facts and not have to worry about

15 whether or not these facts that took place on the day that the

16 original instructions not to cooperate with law enforcement

17 were given, to the extent that there was follow-up during that

18 initially conversation that, "On the other hand, you do what

19 you have to do; you tell the truth to the FBI, to anyone who

20 contacts you."

21      That's a little bit different from what we have here,

22 which is five days separating the alleged intent to commit the

23 crime, substantial steps to commit the crime, and the otherwise

24 efforts to abandon the crime.

25      So let me ask you, Mr. Iredale.

1          MR. IREDALE:  Yes, Your Honor.

2          THE COURT:  In this case, we have this time frame of

3   five days lapsing between the alleged obstruction of justice

4   and the offered abandonment defense.

5          Temporally, is there any limit that the Court would be

6   permitted to take into account in deciding whether or not this

7   type of evidence should come into play?  Could I admit evidence

8   from five months later or eight months later on the eve of the

9   indictment?

10          MR. IREDALE:  No, I think it would be subject to the

11   Court's determination of relevant time period.  In other words,

12   I think the particular crime involved has to be focused on.

13          And in this case, what was being done, what was being done

14   initially, was, "You can talk to them and tell them A, B, and

15   C.  But don't tell them D or lie about D."

16          That was -- and what we have here, interestingly enough,

17   is we have, clearly in a form that neither side can contest,

18   one, what constituted a substantial step.

19          And may I -- in answering Your Honor's question about the

20   time period, may I talk about the time period specifically that

21   is involved here?  Which is, the conversation that took place

22   initially occurred on the 13th of February, 2019.

23          It occurred after -- now, the government's position is,

24   "Well, yeah, but we don't think it's a voluntary and complete

25   renunciation of criminal misconduct, because inferentially he

1    talked to an attorney, and he also had calls with Garmo."

2         Well, that, of course, is, I suppose, their circumstantial

3    case that they want to use to say what we have here was not a

4    voluntary and complete renunciation but it was a decision made

5    because the defendant felt he would be more likely caught or

6    that it was something that he was doing as a ploy.

7         The issue of whether that is correct or not is an issue of

8    fact.  The government has no concrete or specific proof, even

9    though, for instance, they, I understand, had an interview with

10   Mr. Garmo and an interview also with Mr. Bajaj -- at least he

11   testified before the grand jury -- both of whom they say,

12   "Well, he could have -- Mr. Anton could have talked to them in

13   the interim," and therefore when we makes, on the 18th of

14   February, the statement to the agent, "Just tell them the

15   truth.  I didn't do anything wrong.  You didn't do anything

16   wrong.  Tell them.  Talk to them.  Go ahead.  I don't care."

17   And then he reiterates that on the 19th of February in another

18   phone call.

19        And then you have, Your Honor, a set of text exchanges

20   just a couple of days thereafter, also in the month of

21   February, in which Mr. Anton is explaining what he wants the

22   agent to do, apologizing, and telling him to feel free to tell

23   the truth.  And he should do that.

24        Let me, if I could, though, Your Honor, give Your Honor a

25   little bit of a different sequence.

1    There was a phone call on the 13th, and on that phone

2  call --

3         THE COURT:  Let me stop you for a second.

4         MR. IREDALE:  Yes.

5         THE COURT:  Going back to the question about

6  temporally --

7         MR. IREDALE:  The time?

8         THE COURT:  Yes.

9    You do agree, at some point in time -- be it 10 days or 20

10 days -- that the Court would be properly within its -- if not

11 rights, within its authority to conclude that this type of

12 evidence should not be admitted?

13        MR. IREDALE:  It would depend purely on the facts of

14 the case and what the offense is.  In other words --

15        THE COURT:  All right.  So, then, that brings me to

16 my next question.

17        MR. IREDALE:  Okay.

18        THE COURT:  So, in terms of that bright line,

19 wouldn't it be reasonable to assert that that bright line

20 should be at the point in time when the crime has been

21 completed, and that there can no longer be an abandonment?

22        MR. IREDALE:  At the time -- let me if I could do two

23 things in answering that.  One, I need to clarify the

24 chronology in the conversations to address that issue, the

25 temporal gap; and two, I want to talk about the confusion that

1    the government has, which is the difference between completion

2    of the substantive crime and completion of the attempt.  And

3    that --

4              THE COURT:  But that is --

5              MR. IREDALE:  -- suffuses their papers.

6         Let me just say this.  For purposes of our discussion, I

7    am prepared to concede that an attempted obstruction took place

8    on the 13th and the 14th of February.  It was a substantial

9    step toward the completion of the substantive act.

10        But, before the substantive crime was completed or could

11   have been completed or would have been completed, as the

12   defendant understood it -- let me just finish; let me just

13   finish this -- he made a voluntary and complete renunciation.

14        On the 14th of February, the agent told him, "I am not

15   going to be around until Sunday.  I am out of town.  I am

16   leaving on a plane."  So the defendant could not have reached

17   out for the agent because the agent said, "I am going out of

18   town; I will be back on Sunday."

19        And the defendant said, "I will talk to you after you get

20   back."

21        On Monday, the 18th, the call was made, and the call was

22   "Tell the truth."

23             THE COURT:  But what you just said seems --

24             MR. IREDALE:  Let me say this --

25             THE COURT:  No.  No.

1          MR. IREDALE:  Okay.

2          THE COURT:  What you just said is that, from your

3    view of the evidence, that Mr. Anton would have certainly

4    attempted to obstruct justice, but he had not yet committed the

5    substantive offense.  But he is not charged with the

6    substantive offense.

7          MR. IREDALE:  Well, that's right.  And the issue is

8    whether renunciation before the completion of a substantive

9    defense is a defense to an attempt.

10          THE COURT:  I am not even sure if the Model Penal

11    Code would support that.

12          MR. IREDALE:  Oh, sure, it does.  Because, otherwise,

13    you wouldn't need the defense, Your Honor.  That's the other

14    thing they can't get it through their heads.

15          THE COURT:  Well, maybe I can't get it through my

16    head because this argument isn't resonating.

17          MR. IREDALE:  Let me try to make it resonate.  All

18    right.

19       Here is what the Model Penal Code says and what the

20    government doesn't dispute about the nature of the crime of

21    attempt.

22       There is a distinction between mere preparation and a

23    substantial step toward the completion of a crime.  If you

24    commit what is called a substantial step -- and Your Honor was

25    asking me a question, what is the temporal limit?  What is a

1    substantial step?  That's also a factual determination, and we

2    could go round and round about what a substantial step is.

3         But a substantial step constitutes an offense.  If you

4    don't have a substantial step towards the completion of the

5    substantive offense, you don't have an attempt.

6              THE COURT:  So, isn't that your defense?  That, here,

7    you will just show that, "Well, the government is relying upon

8    these events from February 13th, and that, on their face, they

9    don't evidence this substantial step," so --

10             MR. IREDALE:  If you relegate me to that, if you

11   force me to that, I can frame an argument to that effect.  But

12   that's not really what we are saying.  What we are really

13   saying is --

14             THE COURT:  Keeping in mind that the government's

15   theory isn't one that spreads over two days, three days, or

16   four days, five days.  It's focused on February 13th and

17   perhaps February 14 because there was some additional calls or

18   communications on the following day.  So that's the range of

19   dates that we are talking about that their case-in-chief is

20   premised on.

21        So then we have, beyond that time frame, some three days

22   later, this evidence which then begs the question, how is it

23   that something that took place three or four days after the

24   events that are cited in their case-in-chief relevant?

25             MR. IREDALE:  Because of the definition of the crime

1    we are talking about and the facts as known to the defendant.

2    What is the definition of the substantive crime?  The

3    substantive crime is persuading another person to refuse to

4    report, or to dissemble, to lie, to a federal agent about the

5    commission or possible commission of an offense that's being

6    investigated.  That's the substantive offense.

7        So the persuasion to lie takes place when the person who

8    is the object of the persuasion, the witness, lies to the

9    agent, or fails to report to the agent.

10       And in this case, the agent -- well, the agent, who was

11   the undercover, who was pretending to be a potential witness,

12   that agent said, "They haven't called me."

13           THE COURT:  That brings up the issue that the

14   substantive crime could have never occurred given that the

15   person that your client was speaking to was an agent.  No one

16   was ever going to reach out to him to ask him about, "Well,

17   would you submit to an interview so I can ask you what

18   happened," because law enforcement already knew.

19           MR. IREDALE:  That's exactly right, which goes to the

20   playacting nature of the whole alleged offense.

21           THE COURT:  Which is something apart from what we are

22   talking about.

23           MR. IREDALE:  The impossibility in this context.

24   Most of the authorities say impossibility in this context is

25   not a defense.

```
 1            THE COURT:  And that's not what we are talking about
 2   today.
 3            MR. IREDALE:  No, we are not talking about the
 4   impossibility defense.  But I am saying to the Court the fact
 5   that the substantive crime couldn't be committed because it
 6   would have been factually and legally impossible -- the agent
 7   was, in fact, an agent, not a witness, who was going to
 8   dissemble to himself -- then we go to the issue -- let me just
 9   go back and go through the conceptual framework.
10       So, if it's -- if it is not a substantial step, you don't
11   need the defense of renunciation or abandonment, because
12   there's no crime.
13            THE COURT:  Right.
14            MR. IREDALE:  The only time the defense of
15   renunciation or abandonment would come into play is if there is
16   a substantial step, but as it appears to the person who is
17   involved, the substantive crime has not yet been committed.
18       So, that's what we are debating.
19            THE COURT:  That's what the Court in *Young* pretty
20   much concluded.  Isn't that right?  That you don't need an
21   abandonment defense if the government is not able to prove
22   there was a substantial step, that that's the defense that is
23   available.
24            MR. IREDALE:  That's right.  But -- I don't want to
25   make their argument for them, but here is the whole thing.  If
```

1    the charge is to persuade a witness and you say to a witness,

2    "I want you to lie.  Would you tell them this?  Or just leave

3    this out?  Tell them everything that's true, but just leave out

4    this one thing.  Would you do that for me?"  Isn't that a

5    substantial step in the process of persuasion?  I would have to

6    say yeah, I think it is.

7         And that's why we are here today because I could argue to

8    the jury, "No, if you look at this, he said -- you have to

9    judge his intention.  Look at what he said on the 18th.  Look

10   at what he said on the 19th.  Look at what he said on the 23rd.

11   This is not a substantial step because the discussion with the

12   agent was to take place after the 19th, and on the 18th and the

13   19th, he said, 'Tell the truth'; so, therefore, he didn't have

14   that intent and, therefore, it wasn't a substantial step

15   because he didn't reinforce it before the interview."  That's

16   really a contrived argument.

17        What I want to do is to give the devil his due, and to

18   say, "Yeah, saying to somebody, 'I want you to do this; would

19   you please do this,' and trying to persuade them is a

20   substantial step."  I don't see, fairly, how you can say it's

21   not.

22             THE COURT:  All right.

23             MR. IREDALE:  And if that's the case, and it is a

24   substantial step, then the Court is squarely presented with

25   this issue:  Do you have the defense of renunciation?

1          THE COURT:  Let me ask the government.

2      Mr. Iredale raises the issue of factual determinations

3  that are made by the jury, which include whether or not there

4  is this substantial step.  And that given that that is a

5  decision to be made by the jury, how is it that, at this point

6  or at trial, I would reach the conclusion, even after hearing

7  the government's case, that the defense should be precluded

8  from offering evidence that they take the view relates to the

9  substantial step?

10          MR. PILCHAK:  I understand, Your Honor.  I think

11  there's two routes to that conclusion, both of which are very

12  clear.

13      And let me just say.  I appreciate Mr. Iredale's argument

14  very much.  It is extremely well informed and well made.  But I

15  think this is a much simpler issue than we have been grappling

16  with for the last 25 minutes.

17      I think there is no defense of abandonment to the crime of

18  attempt in the Ninth Circuit.  That's the United States'

19  position.

20      And even if there is in some theoretical space between

21  when someone has taken a substantial step and thus becomes

22  culpable for an attempt, *United States v. Bussey* provides

23  clearly, in black letter law in the Ninth Circuit, that there

24  is no defense of attempt when the crime has proceeded well past

25  mere preparation.

1          And I think in this case, the Court can conclude on the

2     facts that the parties essentially agree to in their

3     submissions to the Court that we have proceeded well past mere

4     preparation here; that there was not just one, not just two,

5     but three phone calls in the space of less than 24 hours, when

6     Mr. Anton urged the witness not only to omit things but to

7     affirmatively lie about things if he were contacted by federal

8     investigators.

9          And the other route to that conclusion, besides just

10    legally concluding, Your Honor, that this is not a valid

11    defense in the Ninth Circuit on the agreed-upon facts between

12    the parties, is I think I heard Mr. Iredale concede just now

13    that what happened on February 13 was a substantial step in the

14    direction of an attempt.

15         I certainly --

16              MR. IREDALE:  For purposes of today, yes.

17              MR. PILCHAK:  Right.  And I certainly didn't expect

18    the Court to hold him to that at a trial, regardless of what

19    the menu of the available defenses are for him and his client

20    at trial.

21         But I think for purposes of this legal argument, that's

22    the only conclusion that the Court can draw.  On the facts that

23    the parties don't dispute, before you get to later

24    conversations, that weren't recorded, between Mr. Anton and

25    Mr. Bajaj, or Mr. Anton and the Law Offices of Eugene Iredale,

1    or Mr. Anton and Marco Garmo, and we have to speculate about

2    what could have been in those phone calls and what the

3    circumstantial conclusions from them are, just on the facts

4    that the parties agree on, the Court can be satisfied there was

5    a substantial step in the direction of obstructing justice

6    because that's what Mr. Anton told this person, who he thought

7    was a witness, to do.

8        He urged him, in no uncertain terms, "Don't tell them

9    about the money," between 9 and 11 times, depending on how you

10   count; and, "I would like you to lie to them and say that we

11   are doing this because we are friends.  I've referred you

12   worked; you have referred me work; we are both in the same

13   business; we are buddies," none of which was true, all of which

14   Mr. Anton was only instructing that putative witness to say to

15   cover up everything that had happened, which is the textbook

16   definition, I think, of attempted obstruction of justice.

17       So I think the issue is becoming a little too complex

18   given the legal environment in the Ninth Circuit and the facts

19   that the parties agree on.

20       I would agree, if the Court thought that it needed to

21   decide was an abandonment attempt five days later voluntary or

22   not voluntary, that would be a factual question that I think

23   the jury would have to weigh in on.  But the facts that the

24   parties are essentially stipulating to for purposes of this

25   argument I think are perfectly clear.

1          THE COURT:  So, which case do you rely upon for the

2     proposition that the Ninth Circuit has squarely held that

3     abandonment is not an available or recognized defense?

4          MR. PILCHAK:  It's *United States v. Bussey*, Your

5     Honor, B-U-S-S-E-Y.

6        It's also cited in Mr. Iredale's papers, although he draws

7     a different conclusion from it, so perhaps he will have

8     something to say on this as well.

9          THE COURT:  Let me read from *Bussey*.

10       "Finally, appellant relies upon abandonment; however, it

11    is not sufficient as a defense to proceed well into the

12    execution and then turn away because the plans are found to

13    have been frustrated."

14       So, it's looking at the facts more and their sufficiency

15    versus a determination that, under the Ninth Circuit,

16    abandonment is not a recognized defense.

17       Don't you agree with that?

18          MR. PILCHAK:  I certainly agree with the Court that

19    there is no decision that affirms a district court judge from

20    excluding abandonment.

21          THE COURT:  Because there isn't, number one.

22          MR. PILCHAK:  That doesn't exist.

23          THE COURT:  And two, which is more salient because

24    the backup theory that I opened with would be that, if there is

25    no such defense in the Ninth Circuit, then evidence that would

1   support it is irrelevant.

2        So, then, that brings me to the question, in the Ninth

3   Circuit, is there a decision that clearly states that there is

4   no defense of abandonment?

5            MR. PILCHAK:  So, the language is not as clear as the

6   decisions from other circuits which do say that, as the Court

7   noted earlier, in square language.

8        But my position for the United States is, where the Court

9   says, "An attempt that has gone well beyond mere preparation

10  cannot be abandoned for purposes of a defense to the criminal

11  liability," that means exactly what the Court just said; which

12  is that evidence of supposed abandonment, once you are well

13  past mere preparation, is legally irrelevant.

14       I certainly understand why Mr. Anton wants to put it in,

15  but our position is if it is not relevant to a legal defense,

16  it can only be offered to confuse or mislead or color the jury

17  with irrelevant evidence.

18           THE COURT:  All right.  So, Mr. Iredale, let me give

19  you a couple more minutes to address this question, which is

20  that, as of this moment, it doesn't look like there is a Ninth

21  Circuit decision that clearly and unequivocally states that

22  abandonment is or is not a defense.

23       At the same time, for the Court to exclude what you are

24  offering, the Court will need to determine that abandonment is

25  not a defense.  And so, for those purposes, I will review the

1   First Circuit, the Eighth Circuit, the Model Penal Code.  I

2   will try to read tea leaves from these Ninth Circuit decisions.

3   And keeping in mind that their facts and their analysis was

4   different because of what the record that was presented was.

5       Let me ask you at this point to give me your best argument

6   as to why it is your view that, under the Ninth Circuit, that

7   an abandonment defense is cognizable, is one that is available

8   for a defendant.

9           MR. IREDALE:  First of all, in candor, I have to

10  agree entirely with the Court's assessment of the state of the

11  law in the Ninth Circuit.  There's nothing that says it is a

12  defense, and there's nothing that says it is not a defense.

13      The government's cited the *Temkin* case, which has to do

14  with a different statute, 18 U.S.C. Section 373,

15  subsection (b).  That is the solicitation to commit a crime of

16  violence.  And the statute itself, in 373(b), explicitly

17  provides for the defense of renunciation.  And it defines it as

18  an affirmative defense, which the defendant has the burden to

19  establish by preponderance of the evidence, that involves a

20  voluntary and complete renunciation of criminal purpose that

21  was not motivated by other considerations such as, "Oh, I am

22  going to get caught."

23          THE COURT:  I agree with you.  I am not sure really

24  how much support *Temkin* provides for government.  It doesn't

25  seem to at all.

```
 1              MR. IREDALE:  It provides no support.  What it says
 2    is the facts of Temkin, in a bench trial, were not sufficient
 3    to make out the defense under the statute.
 4         We are talking, though, about a different statute and
 5    whether there is a general defense of renunciation to the
 6    offense of attempt.
 7         Let me, if I could, then, address what Your Honor asked,
 8    which is, as a matter of policy --
 9              THE COURT:  I don't know if I asked about policy, but
10    you can continue.
11              MR. IREDALE:  Well, I am talking about the right
12    thing to do.  I am asking Your Honor to do the right thing.
13              THE COURT:  And I think that is one of the reasons
14    given by the Model Penal Code for recognizing such a defense.
15              MR. IREDALE:  That's right.  So let me just say this.
16    All I have on the side that I argue is the history of the
17    common law, the Model Penal Code, enlightened issues of policy,
18    and a sense of ethics and compassion that I think the law
19    should be imbued with.  And let me address each of those in
20    turn.
21         At common law, renunciation or abandonment was a defense.
22    As a matter of fact, the Model Penal Code drew on that
23    tradition in its formulation of the renunciation defense.  And
24    apropos of that, I need to also say that, as Your Honor knows,
25    it's Model Penal Code Section 5.01.  But they also recapitulate
```

1    the very same language with respect to the offense of

2    solicitation, which I think they touch upon in 506 or 507.

3        In other words, to an -- the idea is this.  To an

4    anticipatory crime, before the substantive evil, the

5    substantive offense has occurred, if the defendant, as a result

6    of examining his conscious or decision to do the right thing --

7            THE COURT:  Let me ask you.  Where does that language

8    come from, "before the substantive evil has come to pass," that

9    you have this opening or this window for abandonment?

10            MR. IREDALE:  That's what the term *locus poenitentiae*

11    means, a place of repentance.  In other words, the law

12    recognizes -- and the Model Penal Code formulates it -- it says

13    before the commission of the substantive offense.  I will try

14    to get the language.

15            THE COURT:  Well, I -- okay.  Because I see what that

16    phrase describes is that before the crime is complete.

17            MR. IREDALE:  Yes.

18            THE COURT:  And so the substantive offense, we know

19    that the substantive offense requires -- if it is a burglary,

20    that the crime is completed.  But when we are talking about

21    attempt, then the question is, in that scenario, isn't the

22    crime completed once you have the necessary intent and then

23    once you have the substantial step?

24            MR. IREDALE:  Yes, but that's bringing us back to

25    what we already talked about, which is, if it's mere

1    preparation, you don't need a defense of renunciation.  You

2    don't need to renounce anything.  If it's only mere

3    preparation, there's no crime of attempt.  The only situation

4    in which you have to determine is there a defense of

5    renunciation is if you have a substantial step.

6         Now, in this case, I know what -- now I think I understand

7    something Your Honor asked me that I didn't quite intuit

8    initially, which is, you are saying, "But, Counsel, there can

9    never really be an offense committed; there will never be a

10   substantive offense in this case because you have a government,

11   undercover agent; and therefore, the only offense in this

12   situation would be attempt."

13        But, what I am saying is, even in that regard, when you

14   look at the issue of attempt and you look at the issue of

15   renunciation, it is not the objective reality, because factual

16   impossibility is not a defense to attempt.  And in fact, most

17   courts say legal impossibility isn't even a defense to attempt,

18   because the mind of the person who is the actor, who is the

19   defendant, is what is at issue.

20        So, of course, this agent was never going to actually lie

21   to another agent who was interviewing him.  But, if the

22   defendant believed that he had asked him to do so, and then

23   intervened before that supposed non-existent interview took

24   place, then he renounced his criminal purpose.

25        Now, the government -- I don't want to get --

1          THE COURT:  Under that theory, then, there would be

2     no temporal limits.  It would be five years, right before the

3     statute of limitations, to the extent that the substantive

4     offense hadn't been completed?

5          MR. IREDALE:  No.  In other words, I don't think

6     it's -- in this situation, for instance, if the defendant just

7     called up and said, "Okay.  Lie to them."

8          And then, instead of calling back and learning they

9     haven't contacted him yet and saying, "All right.  When they

10    contact you, if they do, tell them truth.  Just tell them the

11    truth.  Ignore.  Tell them the truth."

12         And if, for instance, he were to have waited three months

13    or four months, I think it's a reasonable position to say, "No,

14    because in all likelihood, by that time, the interview would

15    have taken place, and therefore your so-called renunciation

16    would have been to no effect."

17         When we are dealing with attempt, we are dealing with

18    things that have not resulted in completed crimes, and the

19    issue really is moral blameworthiness.  That's the other thing

20    I needed to say.

21         The law uses the Latin *locus poenitentiae*, a time -- or

22    actually, in this case, the literal translation is "a place for

23    repentance," a place in the sequence of events before the

24    actual harm has been done, before the crime has been committed,

25    the full crime, substantive crime, the object crime, in which

1    the actor can say, "I reconsider; this is wrong; I am not going

2    to do it."

3         And that, of course, goes into the whole issue the Model

4    Penal Code addresses, which is, "Yeah, but if somebody does an

5    attempt, doesn't that indicate blameworthiness and danger?"

6    And they then say, on the other hand, "But the utility of

7    dissuading somebody from committing a crime and from causing

8    the harm is much greater by recognizing the defense."

9         And the other thing is simply, as an ethical principle.

10   People come before you every day and they say, "I have done

11   wrong.  I admit that I did wrong."  And that is not merely a

12   legal construct; it's an ethical construct.

13        So, here is what I am saying; that, fundamentally, we all

14   fall short of grace, and that the law should recognize the

15   ability of a person to say, "I made a mistake.  I made a

16   decision, but I am going to undo it.  I am going to do what I

17   can to say no, we are not going to do that.  I am not going to

18   let this happen.  I am not going to persuade somebody to lie.

19   And I am going to try my very best to undo it."

20        Now, what motivated that?  That's an issue for the jury.

21        But we have, right here, at least framed for the motion

22   *in limine*, the perfect factual formulation for this issue which

23   we are presenting to you.

24        And I realize also, I should probably have submitted all

25   of the transcripts to the Court, and maybe I should do that.

1    But the language that is used on the 18th and the 19th and the

2    two or three days after that, in the phone calls and the texts,

3    are as clear a renunciation of criminal purpose as you can see.

4             THE COURT:  Is there something from the 13th and the

5    14th transcripts that would perhaps leave things ambiguous

6    enough or open enough where the defense would argue that what

7    then was said following up on these conversations, on the 18th

8    and the 19th, are matters that should be considered?

9             MR. IREDALE:  Yes.  And Your Honor put your finger

10   right on it.  You hit the nail right on the head.

11        Because in both the conversations on the 13th and 14th,

12   the conversation is, "In the unlikely event that somebody talks

13   to you."  And on the 14th, it's even more clear, that, "This is

14   only a remote likelihood," that he will be contacted because

15   his file was seized in the course of the search.

16        But by the 14th, Mr. Anton is saying, "They are just

17   looking to see if these guns are properly registered.  That's

18   what I think is going on."

19        And so, at that point, at the 13th and the 14th, there is

20   no imminent interview likely to take place -- it is only a

21   speculative possibility -- so that an intervention by the 18th

22   would be a renunciation that would be, given this factual

23   understanding, an effective one.

24        I understand what Your Honor is saying now.

25        In other words, you can't do an attempt and then wait

1    forever and then maybe come up with something three or five

2    years later.  No.

3        I think the analysis has to be, given the factual setting,

4    how imminent was the substantive wrong in the defendant's mind?

5    In this case, if it is an obstruction, the substantive wrong is

6    the actual persuasion of a witness to lie to the agent.

7            THE COURT:  Wouldn't it make sense to conclude that,

8    certainly, within two or three, four days, after these search

9    warrants are executed, when law enforcement is now taking a

10   look at what has been going on, that it's most likely that they

11   will be turning to someone like the confidential source, if he

12   had been a regular person, a regular customer of your client?

13           MR. IREDALE:  Within two to three days, Your Honor?

14   Absolutely not, especially since it was the agent, in his

15   undercover role, who chose to say, "I am going to be out of

16   town."  In other words, he wouldn't be able to be located by

17   any prospective investigators at his regular home or place of

18   employment.  He is out of town, out of pocket.

19       And when he came back --

20           THE COURT:  After the 13th?

21           MR. IREDALE:  After -- he says, on the 14th, "I am

22   getting on the plane later this morning."  And so he is out of

23   town.  He says, "I will be back on Sunday."  Sunday was the

24   17th.  And the defendant called on the morning of the 18th and

25   said, "Don't do it."

1    In other words, in the context of this case, it's -- and I

2    concede, Your Honor, that I suppose there are some cases in

3    which agents seize thousands of papers from multiple locations

4    and then, immediately, within 24 to 48 hours, are interviewing

5    all of the relevant people.  But in this case, there was a

6    substantial amount of time.  I think the indictment didn't come

7    down for a year.

8        THE COURT:  November, right?

9        MR. IREDALE:  Yeah.  But we are talking about not

10   what the actual facts were but what they would have appeared to

11   be to Mr. Anton.

12       And so, fairly, constrained with that scope, I have to

13   say, a reasonable jury could say, given that the search took

14   place on the 13th; the witness left on the 14th and would not

15   be back until the 17th, which was a Sunday; and Mr. Anton

16   called up on the 18th, which was a Monday, and said, "Don't do

17   it," I believe that a reasonable jury under a proper

18   instruction could find that that renunciation was timely enough

19   to have had it -- had the agent been a real person, it was

20   timely enough so that the false statement to the agent could

21   have been avoided or averred.

22       THE COURT:  All right.  Let me hear from the

23   government in response.

24       MR. PILCHAK:  Thank you, Your Honor.  You might not

25   be surprised to hear that I disagree with almost everything

1    Mr. Iredale said.

2         First of all, there is zero ambiguity in what Mr. Anton

3    said and did on the 13th and 14th of February.  If I had

4    written the transcript myself for someone that I planned to

5    prosecute for obstruction of justice, I couldn't have written a

6    clearer transcript to evince an intent to get the person on the

7    other end of the phone to lie to investigators.

8         And Mr. Anton reached out to that undercover agent between

9    four and six hours after the agents left his home that morning.

10   The search warrant was executed about eight o'clock in the

11   morning of the 13th; the agents I believe had packed up about

12   10:30, 11:00 o'clock that morning; and within hours, Mr. Anton

13   picks up the phone and calls Shawn Jones -- the undercover

14   agent's alias -- because, apparently, at the top of his mind

15   and the top of his "to do" list, since that search warrant was

16   executed, was to reach out in clear and unambiguous terms to

17   that person and say, "Hey, if the FBI contacts you, be sure not

18   to tell them that you paid me $1,000," and to tell them all

19   those lies that I just cataloged for the Court a moment ago,

20   "lies about our relationship, lies about how we know each

21   other, why I am helping you, and what we have done together in

22   the past that would make that seem reasonable if an agent talks

23   to you."

24        To go back to the *Temkin* case, which I understand the

25   Court is not impressed by.  I actually do think it is

1    instructive on this point.

2         It is both a solicitation case under the statute that

3    Mr. Iredale cited, with the statutory defense; but it's also a

4    Hobbs Act robbery or Hobbs Act interference with commerce by

5    threats or violence case.  And it is on that count that the

6    Court addresses abandonment as well, where there is no

7    statutory defense.  And the Court cites *Bussey* and says, "Look,

8    abandonment is not a defense when an attempt has proceeded well

9    beyond preparation," as in this case.

10        What were the facts of *Temkin*?  Well, it was a

11   murder-for-hire case, where the defendant hired a hitman, who

12   was an undercover federal agent, and he sends him out during

13   their meeting to do the deed.  They have their conversation;

14   they have a meeting of the minds that the hitman, who is really

15   an agent, is going to go out and kill the intended victim.  And

16   then, later the same day, the defendant in *Temkin* -- which is

17   T-E-M-K-I-N -- he calls that putative hitman back and says,

18   "Hey, I think the FBI might be looking at me; maybe we should

19   put everything on ice."  And it is same day, Your Honor.  There

20   was scarcely any time at all.

21        And the Court found in *Temkin*, "Look, that plan had

22   proceeded well past mere preparation.  He had wound the hitman

23   up and sent him out into the world," just as Mr. Anton did with

24   the supposed witness in this case.

25             THE COURT:  But in *Temkin*, we have the Court

```
 1   observing, "Temkin argues that even if there were sufficient
 2   evidence of his intent to solicit murder, based on the July 8th
 3   meeting, in his subsequent voicemails, he abandoned the plan."
 4   And then it makes reference to this voluntary and complete
 5   renunciation of criminal intent as an affirmative defense.
 6        It goes on, "Temkin failed to meet his burden of proving a
 7   voluntary and complete renunciation by a preponderance of the
 8   evidence."
 9        So, again, this is one of those cases where it's an issue
10   of sufficiency, sufficiency of the evidence, versus concluding
11   that there is no such defense as renunciation, in the Ninth
12   Circuit, for an attempt.
13             MR. PILCHAK:  Right.  And Your Honor, as I conceded
14   earlier, there is no case that says in black and white that
15   abandonment never --
16             THE COURT:  But I don't really see how Temkin moves
17   the ball up the field.
18             MR. IREDALE:  Actually, the language that you just
19   read, that he did not satisfy his burden of proving a voluntary
20   and complete renunciation, suggests at least a sub silentio
21   adoption.
22             THE COURT:  Well, it also is coupled with the
23   18 U.S.C. Section 373(b), affirmative defense.  That's
24   different from our case.
25             MR. PILCHAK:  Yes, Your Honor.
```

1      But I am actually citing from the next section of the

2   opinion, which begins at Section (b), interference with

3   commerce by threats or violence.  And the second full paragraph

4   of that section, reads, in the third sentence, "Additionally,

5   Temkin's abandon argument fails because abandonment is not a

6   defense when an attempt, as here, has proceeded well beyond

7   preparation."

8      So I think once the *Temkin* Court is outside of the

9   statutory defense that Mr. Iredale is talking about, for

10   solicitation, and it's just asking itself is there a

11   free-floating defense on abandonment to an attempt in the Ninth

12   Circuit, the *Temkin* Court goes back and reads *Bussey* -- which

13   is the authority that the United States is relying upon -- to

14   say, "Look, it is not a defense, if what you are talking about

15   is an attempt that has gone far past mere preparation," which I

16   think everyone looking fairly at the facts of this case would

17   say Mr. Anton's conduct did.

18      He clearly and unambiguously instructed the witness to lie

19   in three different phone calls over less than a day.  And his

20   supposed abandonment, not only was it five days later, Your

21   Honor -- and I understand, Mr. Iredale makes what is a very

22   clever argument on the facts of this case, saying, "Well, of

23   course, it was a timely abandonment because the undercover

24   agent had told Mr. Anton, 'I am going to be out of town for a

25   while.'"

1    I didn't find that argument quite as impressive because I

2  think the FBI also as telephone capabilities and they would

3  have been able to reach a witness had they wanted to.  They may

4  not have been able to do an in-person interview on his front

5  doorstep, but I think now we are just guessing about what was

6  in Mr. Anton's mind.  And I think when you read the facts of

7  this case against what is present in the case law, where courts

8  like *Temkin* reject an abandonment defense for a supposed

9  abandonment that was the same day as the offense, I think in

10 this case you can see why, five days later, after talking to

11 two lawyers and talking at least six times with his accomplis

12 and confederate in the crime, who had been told to his face,

13 "Hey, that person that you sent to Wil Anton for help with his

14 CCW, that guy was an undercover ATF agent."

15        MR. IREDALE:  Just a second.  I have to object to

16 that.  There's no argument.  There's no facts.

17        THE COURT:  I will let you respond.  You can be

18 seated.

19    Going back to *Temkin*, the portion that you read, "Temkin's

20 abandonment arguments fails because abandonment is not a

21 defense when an attempt, as here, has proceeded well beyond

22 preparation."

23    So, it's looking at the facts versus saying that

24 abandonment is never a defense.  And so, that doesn't provide

25 me with the proof that the Ninth Circuit has concluded that

1   abandonment is not a defense.  And we keep coming back to the

2   same theme over and over again, where the Court will speak

3   about abandonment but time after time will find that, you know,

4   this isn't sufficient to support an abandonment type of

5   defense.

6        And going back to my original observations, we don't have

7   a case such as this, though, where we have this temporal spread

8   between the allegedly committed attempt and this renunciation.

9   So I think our facts are unique.  They are different.  And it

10  does require the Court to come down on one side or the other of

11  whether or not there's an abandonment defense.  And then, to

12  the extent that I find there is no abandonment defense, then

13  would be in a position to find that this evidence is not

14  relevant.

15       On the other hand, if the Court were to conclude that

16  there is room for an abandonment defense, or that it's

17  premature to make an ultimate determination -- which, as we

18  know, motions *in limine* are threshold determinations.  And so,

19  the fact that, as a threshold matter, the Court would find that

20  the evidence has not been demonstrated to be relevant and its

21  likelihood to confuse the issues is so great that I am going to

22  exclude it, that wouldn't prevent the Court from revisiting the

23  issue at trial once we have the evidence in the record as to

24  the government's theories, as to the government's

25  case-in-chief.

 1        But at this point, I think I am satisfied that I have

 2   heard from the parties as to their respective positions, and it

 3   is just a matter of me deciding as to whether or not I see the

 4   Ninth Circuit recognizing or not recognizing an abandonment

 5   defense.

 6        So, I am going to take the matter under submission, and I

 7   hope to have something within the next week or so.  That will

 8   guide us through the beginning of the trial and recognizing, as

 9   I just said, motions *in limine* -- orders on motions *in limine*

10   can be revisited at trial based upon changed circumstances or

11   the state of the record.

12        Is there anything else to address at this moment?

13            MR. PILCHAK:  We did have some housekeeping things

14   for trial, Your Honor, if you would indulge us for five more

15   minutes.

16            THE COURT:  All right.

17            MR. PILCHAK:  Just to update the Court on the status,

18   since the last hearing, the United States has disclosed our

19   draft exhibit list, our draft witness list, *Giglio* and Jencks

20   materials, all consistent with the Court's pretrial order.

21        We have sent some proposed stipulations to the defense

22   that we are discussing and we have provided an advance copy of

23   our proposed jury instructions to see where the parties may be

24   in agreement because we are on schedule to submit those to the

25   Court on Monday.

1    We did not receive any exhibit lists from the defense.

2    And we are, as I said, hopeful that we can come to some

3    agreement on stipulations and jury instructions soon.

4    We also produce a twelfth round of discovery which

5    includes those *Giglio* and Jencks materials on schedule as

6    ordered by the Court.

7    Otherwise, it is more, sort of, fine detail housekeeping

8    questions for the Court, Your Honor.  I was hoping the Court

9    could clarify which days we are looking at having trial and

10   which days we are looking at being dark.  I know we are all

11   understanding we are starting on March 8, but I was imagining

12   the Court would keep one day reserved for calendars; I am just

13   not sure which.

14   THE COURT:  Yeah, I would be planning to go from

15   Tuesday through Friday, and then I would be dark on Mondays.

16   MR. PILCHAK:  Very good.  Thank you.

17   And then just another question with, sort of, the changing

18   format for COVID protocols and courtroom procedure, I saw a

19   trial that the Court had recently where the courtroom was

20   reversed.  I believe it's my understanding that the Court is

21   not going to be doing that going forward; is that correct?

22   THE COURT:  I probably won't.  That was before the

23   governor rescinded the mandates regarding the wearing of masks

24   indoors, or modified the rules.  And at this point, I am more

25   than likely going to have the jury sit in the jury box.  But as

1    we have seen these last two years, things have changed

2    unpredictably overnight.  But that would be my inclination,

3    that would be my hope, is that we would have the jury in the

4    box.

5              MR. PILCHAK:  Thank you, Your Honor.

6         And then, with respect to masking for counsel and parties

7    and the witnesses, would it be the same as the Court sort of

8    advised us at the beginning of this hearing?

9              THE COURT:  The same as the clerk or the Court?

10             MR. PILCHAK:  I believe when we started the hearing

11   you told us --

12             THE COURT:  I told you -- yes.  Yeah.

13        I would be prepared to allow the participants to go

14   without a mask to the extent that are vaccinated, and then to

15   be masked up if they wish, except for witnesses, to the extent

16   that a witness is testifying.  And if they want to be masked,

17   we would provide them with a clear mask.

18             MR. PILCHAK:  Okay.  And I ask only because, you

19   know, some people in the world that we live in now, with the

20   polarization and how people approach questions like vaccination

21   and masking, sometimes, and anticipating having a number of

22   members of the community in the jury box approaching this from

23   different ways, is the Court envisioning talking to the

24   witnesses as they come into the courtroom about their

25   vaccination status and their masking, or is the Court relying

1   on the parties to do that for witness that we call?

2          THE COURT:  Well, in the past, I have.  And at the

3   same time, if you wish to do that screening in advance, to let

4   me know that there are some witnesses who are not vaccinated,

5   and so then it would be understood that they would testify with

6   a clear mask, then we can proceed in that manner, if you are

7   concerned about what it would appear like or whether or not it

8   would have some jurors take a dim view of a witness if they

9   were not vaccinated.

10         MR. PILCHAK:  Okay.  That's all very helpful.

11     I also wanted to ask, does the Court have a sense of how

12  many alternates it plans to seat?

13         THE COURT:  Two or three.

14         MR. PILCHAK:  Okay.  And finally --

15         THE COURT:  I think part of that might depend upon

16  how we do during jury selection, if we have three, if we only

17  are left with two.  We are going to summon 46.  Hopefully, that

18  would be enough for yous to have our 12 jurors, plus

19  alternates.

20         MR. HADEN:  Your Honor, it makes sense for the Court

21  to look, real time, as to how jury selection plays out.

22     For the United States, I would just note, until the case

23  in front of Judge Sammartino goes on the 28th on February, I

24  believe this is the first multi-defendant multi-week jury trial

25  in over two years in the district.  And a trial that spans

1    three weeks, I would just express to the Court that perhaps

2    more alternates might be a good investment, so that if, for

3    some reason, there is a challenge on the jury, with COVID, that

4    we don't lose the trial, for example, on day 11, and all of

5    that effort, with a dwindling jury, has to be redone.

6         So that was a concern for the United States, just the

7    length of this trial, and the amount of interaction that

8    everyone involved in it will have, that I think increases the

9    probability that we could have a challenge.  We are certainly

10   not hoping to have that challenge.  We will abide by all the

11   protocols and we hope everyone stays healthy.

12        THE COURT:  And I think what you said does resonate

13   with the Court.  And in some ways can even justify having us

14   utilize the facing—out format for the trial in order to have a

15   little bit more spacing amongst the jurors, to the extent that

16   they will be in close proximity for two to three weeks.  So I

17   will take all of that into account.

18        Do you have any different views, or similar views,

19   Mr. Iredale?

20        MR. IREDALE:  Whatever the Court's thinks, is

21   entirely with Your Honor's discretion.

22        I would hope that, if possible, if we could —— just

23   because an old mule knows the path that it's been taught, and

24   if you say, "Do something different," it's very hard sometimes.

25        THE COURT:  For an old mule?

 1          MR. IREDALE:  Yes.

 2          MR. HADEN:  Your Honor, I guess, just to complete

 3    that, I think as long as the numbers are trending the way they

 4    are going, I think the United States' preference would be to

 5    try the case in the traditional format, if that's available;

 6    but maybe some other assurances like extra alternates could

 7    help put in safeguards in place.  But, of course, at the

 8    Court's discretion.

 9          THE COURT:  All right.  Anything else?

10          MR. PILCHAK:  Just the very final one on my list,

11    Your Honor.  We would request -- which I think is a routine

12    order -- an order excluding testifying witnesses from the

13    courtroom.  But we would ask for an exception for that for our

14    two agent case agents, one from ATF and one from FBI.

15          THE COURT:  And I will permit the defense, to the

16    extent they have an investigator that has assisted them, to

17    also be in the courtroom during the trial.

18          MR. PILCHAK:  Thank you.

19          THE COURT:  Anything from the defense?

20          MR. WARREN:  Just extremely briefly, Your Honor.

21    Much of what the government or Mr. Pilchak told you about our

22    meet-and-confers, these were at our request, that we have been

23    having meet-and-confers.  We are trying to do this as

24    efficiently as possible.

25          The government has committed to give us the witness's --

1    they have given us a witness list, but in terms of the order of

2    witnesses, they have committed to giving us two days in

3    advance, obviously, to the best of their ability with -- not

4    necessarily locked in, but to the best of their ability.

5        Similarly, with regard to opening statement, the party

6    will exchange any exhibits in advance, I am assuming a couple

7    of days in advance to see if there are any objections or issues

8    that need to be raised.

9        Finally, Your Honor, we had hoped, in other cases that I

10   have done where they are paper heavy and the government comes

11   in with its audio/visual equipment and whatnot, we have been

12   able to get them to agree we give them a thumb drive or

13   whatever, and we can just ask their paralegal to put up our

14   exhibits; and apparently, at least as of now they've declined

15   to do that.  We hope to convince them otherwise, because it is

16   just an extra burden for us.  We may need to go to the court

17   and request ancillary services, whatnot.

18       I am not asking for anything; I am just telling the Court

19   that's where we are at with regard to display of exhibits.

20            THE COURT:  And as far as the defense exhibits and

21   witness lists, are those things that you anticipate will be

22   produced?

23            MR. WARREN:  At some point.  Right now, we do not

24   have any particular exhibits other than cross-examination.  We

25   don't have a witness list either, at least for our side.  But

 1   we will certainly -- there's no effort to conceal, anything

 2   like that.  We will provide what we can to the government.

 3            THE COURT:  And then, as far as the opening

 4   statements, what is the request as far as the testimony that

 5   should be allowed?  Does the government have a particular time

 6   frame in mind?

 7            MR. HADEN:  Your Honor, I have tried cases in here.

 8   I don't know that I have been cut off, but I think a 30-minute

 9   estimate would be appropriate.

10            THE COURT:  All right.  Does the defense agree?

11            MR. WARREN:  Mine will be way shorter than that; but,

12   sure, that's as an outside.

13            THE COURT:  So I will provide the parties 30 minutes

14   per side -- per party, I should say.

15            MR. IREDALE:  Per party, Your Honor?

16            THE COURT:  Yeah.  30, 30.

17       All right.  And then, Mr. Tilotta and Mr. Anton, you are

18   reminded you are ordered to be present in this courtroom on

19   March 8, at 8:30 a.m.

20       Do you understand, Mr. Tilotta?

21            DEFENDANT TILOTTA:  Yes, Your Honor.

22            THE COURT:  Mr. Anton?

23            DEFENDANT ANTON:  Yes, Your Honor.

24            THE COURT:  Then, the matter will be taken under

25   submission.  Thank you all.

1          MR. IREDALE:  Thank you, Your Honor.

2          MR. WARREN:  Thank you, Your Honor.

3          MR. HADEN:  Thank you, Your Honor.

4          MR. PILCHAK:  Thank you, Your Honor.

5      (End of proceedings at 3:36 p.m.)

6                        -o0o-

7              C-E-R-T-I-F-I-C-A-T-I-O-N

8          I certify that the foregoing is a correct
transcript from the record of proceedings in the above-entitled
9  matter.  Dated:  May 1, 2023.

10                    /s/  Chari Bowery

11                    _____

                      Chari Bowery, CSR No. 9944, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25